UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION


TAMARA M. HINE,                             )
           Plaintiff,                     )
                                           )
      vs.                                    )        1:09-cv-416-SEB-TAB
                                           )
EXTREMITY IMAGING PARTNERS,                  )
INC.,                                        )
           Defendant.                     )


**ENTRY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**


This matter is before the court on Defendant Extremity Imaging Partners, Inc.'s

("EIP") Motion for Summary Judgment (Doc. #36).  For the reasons explicated in this

entry, the motion is granted.


*Factual Background[1]*


EIP is a company which provides magnetic resonance imaging (MRI) services and

---

[1]We have set forth the facts in a manner which allows the Plaintiff all favorable inferences as the nonmoving party.  However, we take this opportunity to point out that Local Rule 56.1 requires that a party's summary judgment response brief include a section "labeled 'Statement of Material Facts in Dispute' which responds to the movant's asserted material facts by identifying the potentially determinative facts and factual disputes which the nonmoving party contends demonstrates that there is a dispute of fact precluding summary judgment." Plaintiff's response brief includes a section titled "Statement of Disputed and Additional Material Facts," which emphasizes the "additional" and immaterial facts and is aimed more at swaying the emotions of the reader than identifying the true factual disputes that might prevent the entry of summary judgment.  This is clearly not what was intended by our Local Rules and we wish to note that the inclusion of materially irrelevant facts does nothing to help a party's cause; to the contrary, it detracts from the legitimate pursuit or defense of the motion.

support specifically focused on a patient's extremities. During the time periods relevant to this lawsuit, it marketed its services to physician specialists, such as podiatrists, in part through regional account managers. The six regional account managers working at the time Plaintiff held that position with EIP answered to George Beluk, who worked out of EIP's home offices in Wexford, Pennsylvania. Not long after Plaintiff's employment was terminated, EIP let all of its regional account managers go due to financial circumstances.

In November 2006, Beluk hired Susan DeMunbrun as a part-time account manager to cover the Indianapolis region. Ms. DeMunbrun worked in that capacity for a little less than seven months before resigning because she found it too difficult to work for Beluk. According to DeMunbrun, Beluk had a poor reputation for honesty, asked her to lie to a superior if she were ever asked about a particular division sale Beluk had discussed with her and, in general, made it hard for her to do her job. While DeMunbrun states that Beluk never made any sexual advances toward her, he did make her feel uncomfortable during her short tenure by referring to the regional managers as his "girls," commenting on other employee's sexual affairs and referring to her "nice looks." According to DeMunbrun, Kim Bourke, an account manager from Dayton, Ohio, who interacted often with DeMunbrun, had complained to her as well about her feelings of discomfort around Beluk.

After DeMunbrun resigned in May 2007, Beluk offered the job to Plaintiff, Tamara Hine, who had applied to and interviewed with Beluk for the Indianapolis

position when it had been offered to DeMunbrun.  Beluk telephoned Hine and told her that the previous hire had not worked out and he wanted Hine to consider taking the job of part-time[2] account manager for EIP in  the Indianapolis region.  Hine recalls that Beluk had made her feel somewhat uncomfortable by the way he had stared at her during her interview, but she was not particularly concerned about that and thought that she was a good fit for the job based on her past marketing experience, so she accepted the offer of employment.

Hine traveled to Dayton on May 30, 2007, to complete her employment paperwork, to meet with Beluk and to receive training from  Kim Bourke.  While in Dayton, her training consisted of shadowing Bourke on doctor's calls and discussing Bourke's daily routine with her.  Beluk had provided her with a box of information and materials that had come from DeMunbrun and told Hine to take as much time as she needed to study the company's services and prepare herself to market them.  Hine had worked in the health care industry previously, prior to putting her career on hold to raise her children.

On the evening of May 30, 2007, Hine, Bourke and Beluk went to dinner.  Hine felt that Beluk was staring at her again, similar to his behavior during her interview.  Beluk commented about how lucky he was to be having dinner with two attractive

---

[2]Part-time employment was to total no more than 25 hours per week.

women and that other men in the restaurant were probably trying to figure out why he was the lucky guy with two attractive dates. Such comments from Beluk as well as what Hine describes as other non-personal "sexual" jokes or comments made by Beluk that evening left her feeling uncomfortable. However, since she was going to be working in Indiana, she did not think it likely that Beluk's conduct would be repeated or that he would cause any problems for her in her day-to-day work.

In July 2007, Beluk traveled to Indianapolis for a marketing lunch and a client appreciation dinner which Hine had arranged. In between the lunch and dinner, Beluk again made "snide little sexual jokes" and commented on Hine's appearance. According to Hine, Beluk was very professional and all business while they were with the podiatrists at lunch and dinner, but when the doctors were not around, he made inappropriate comments and continued to stare at her in a way that made her feel uncomfortable.

In late September 2007, the Indiana Podiatric Medical Association held a conference in Indianapolis. Hine, Bourke and Beluk attended the conference and, according to Hine, Beluk continued to make offensive comments and tell sexual jokes while around her and Bourke. Unlike the other times they were together concerning which Hine has no recollection of Beluk's specific sexual or distasteful comments, during the conference Beluk told stories and made specific statements which Hine does recall as being highly inappropriate. Beluk told Hine and Bourke, embellished by a descriptive rude gesture, that his wife was a "feisty little redhead" who had given him "the finger"

the first time he approached her. Beluk commented that his wife's feisty attitude is what "turned him on"; he later mentioned that he thought Hine and Bourke had some "feistiness" in their personalities as well. At some point in their conversations, Bourke commented that her mother was aging and her "rear end was drooping," to which Beluk responded that he couldn't imagine either Bourke or Hine being in that condition. Both Bourke and Beluk also commented in detail about an employee at the home office who was apparently notorious for wearing revealing attire.

According to Hine, while Beluk was in Indianapolis attending the convention, Bourke had begged her to go with them to dinner because it was so exhausting for Bourke to try to keep Beluk entertained and she was not always comfortable being alone with him. However, Hine had previous commitments which prevented her going to dinner with Bourke and Beluk. Over the course of her employment with EIP, Hine claims to have had several other conversations with Bourke regarding Beluk's inappropriate comments and behavior and the manner in which he made both women feel uncomfortable when they were around him.

Hine received no hands-on training or instruction and had only very limited interaction with anyone other than Beluk from the home office. Her job was to grow the business in the Indianapolis area and make sure the current customers of EIP were satisfied. Beluk encouraged her to develop marketing strategies, providing her with a book to help inspire her. She would fax her time sheets and her expense reimbursement

requests to Judy Moffa, EIP's Vice President of Business Administration, but Hine claims she was never informed of the names of people who occupied the company's chain of command. Nor did Hine ever receive an employee handbook, policies or guidelines and, despite her request to Beluk for an opportunity to do so, she never visited the home offices in Pennsylvania.

Beluk telephoned Hine often, too often, in her opinion. He would often discuss personal issues in addition to work related matters. He would discuss his and Hine's spouses and inquire as to who wore the pants in her family or whether, like him, she enjoyed "making up" after arguments. During one such conversation, Hine told Beluk that "it was too much information" and his remarks were becoming "inappropriate."

On one occasion, Hine mispronounced Beluk's name during a conversation and, in response, Beluk told Hine he was going to have to start calling her "Hiney." Another time Beluk expressed to Hine his belief that women hold an advantage over men as salespersons because they are able to use their sex appeal on the job. Beluk encouraged Hine to use her attractiveness to her advantage in connection with her visits to doctors' offices. Hine would attempt to discourage Beluk from making what she considered inappropriate statements by not responding to them, or, if he were talking with her in-person, by walking away or turning her head away.

On November 10, 2007, Hine and her husband traveled to Pennsylvania to attend

the EIP holiday party. They met Beluk and his wife at the hotel where the party was held and, according to Hine, Beluk immediately began flirting by commenting on how attractive Hine looked and mentioning how lucky he was to have the best looking department in the company. According to Ms. Bourke, during the party Beluk told many of the employees, including Bourke, that they looked beautiful or amazing. Hine described Beluk as having "wandering eyes" during the holiday party.

Hine claims that when she worked more than the 25-hour limit for a particular week which she was supposed to adhere to as a part-time employee, Beluk authorized her to "carry-over" any extra hours to the next week's time sheet. On December 20, 2007, in an e-mail exchange with Beluk, Hine wrote: "Also, just fyi ... I will be carrying over some hours to next week. I really want to spend some time (and need some input) in trying to put together some type of marketing packet." When Hine submitted her time sheet to Judy Moffa for the week following Christmas 2007, she included a full 25 hours, with time included for the 26th, 27th and 28th of December. Moffa was suspicious of the hours submitted by Hine because she knew that quite a few doctors close their offices during the week following Christmas. Moffa telephoned Hine to inquire about the weekly hours report she had submitted. Hine explained that the hours listed for the 26th were hours carried over from the previous week and that she had worked on a marketing plan the other two days: eight hours on the 27th and nine hours straight, without a break, on the 29th. Moffa was still suspicious of the hours report submitted by Hine because she

also knew that Hine had school age children who would not have been in school the week following Christmas, making it difficult for her to have worked the hours she claimed, so on January 7, 2008, she reported her suspicions to David Blue, EIP's Executive Vice President.

Blue reacted to Moffa's report by telling Moffa to ask Hine for a copy of the marketing plan she had been working on, which Moffa did, but Hine could not provide it. When Moffa told Blue that Hine said she did not have a plan which she could send in, Blue telephoned Beluk that same day to ask if Beluk had requested or authorized Hine to create a marketing plan. Beluk's response to Blue was that he had not sought a marketing plan from Hine, nor had he authorized her to create one.

In response to the inquiries she was receiving regarding her hours report for the week after Christmas, Hine sent an e-mail to Beluk on January 7, 2008, which stated in part as follows:

> I am deeply hurt by what has transpired. I believe it has escalated from a misunderstood phone conversation. Trust and Honesty are two qualities I hold most important in my morals and values. ...
>
> I had sent an email to you reminding you of the carry-over hours in which I turned them in as hours worked on 12/26. Thursday and Friday of that week were hours in which I had a lot of catch-up work that needed to get done and additionally, hours that were used to try to better prepare myself for the start of a new year with high goals of bettering myself as a marketing rep that would show in greatly increasing my numbers for the company. I studied my territory and doctor's referral numbers with notes and a plan for each, answers to questions that I need to gain in order to better understand each one of their practices, working on and updating files

for each of my doctors, went through the huge box of material that I was given when taking on this position in which I never took much time to do from the beginning because of the importance of getting out into the field, transferred EIP files over to a new computer that I can be taking into the field, setting up a fax to use for EIP instead of having to drive to the center or use Staples, made a new doctor list with corrections, updates, and additions, made some important doctor calls especially in trying to secure appointments for a dinner when you come to Indy, took time to go into the EIP website to have a better understanding of it to use in my marketing, and went through literature in trying to get a plan of some type of marketing tool that I would like to use. There was not a completed presentation on this due to the fact that I wanted to talk to you considering some questions about including the reimbursement article and anxiously awaiting the new marketing literature that you spoke about in our conference call.

I planned that week to accomplish these tasks and never imagined that it would pose a problem or mistrust. I did work and these tasks were my 'marketing plan' that was referred to.

.... If the company would like me to cut my hours, I will consider. I do need to and would like to work 20-25 hours a week as told at the interview process. If the company needs my resignation due to this misunderstanding, please let me know. I do know that I can not be happy with my job and therefore, successful at my job if I fell that I am not trusted and need to be babysat. Or, if you would like to tell me exactly what to do, who to see, and a plan to follow, I will consider that as well. If you need to forward this email to anybody else, please don't hesitate.

On January 8, 2008, David Blue instructed Beluk to fire Hine based on the allegedly false time report. Beluk was in Ohio that day, so he telephoned Hine to inform her that her employment was being terminated. Hine describes the call as "hostile," which included Beluk yelling at her. She requested a meeting, but claims Beluk simply hung up on her. Phone calls she placed to Beluk later that day went unanswered and her phone and access to the company's internet portal were disconnected as well. The

following day she communicated via email to Beluk regarding her dismay with the sudden termination. A few days later she again emailed Beluk to request copies of her employee file, a copy of the company policy handbook and instructions on the return of company materials. Hine also inquired about her final pay check. Moffa, not Beluk, responded to Hine's email with answers regarding Hine's submission of final expenses, the timing of her last paycheck and the return of company property. Moffa also instructed Hine to direct any further questions she may have directly to EIP's in-house legal counsel.

Hine filed a charge of discrimination with the Equal Employment Opportunity Commission on January 18, 2008, and received her right to sue letter with a notice dated January 7, 2009. She filed this lawsuit on April 3, 2009, alleging age discrimination in violation of the Age Discrimination in Employment Act as well as sex discrimination and retaliation in violation of Title VII of the Civil Rights Act. She has subsequently dropped her claim of age discrimination and limited her claim of sex discrimination to a hostile work environment claim and a retaliation claim.

### *Summary Judgment Standard*

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

-10-

Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id*., 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc*., 209 F.3d 687, 692 (7th Cir.2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id.* at 325; *Doe v. R.R. Donnelley & Sons, Co.*, 42 F.3d 439, 443 (7th Cir.1994).

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp*., 24 F.3d 918, 920 (7th Cir.1994). The record and all reasonable inferences that may be drawn from it are viewed

in a light most favorable to the party opposing the motion. Anderson, 477 U.S. at 247-52.

Therefore, after drawing all reasonable inferences from the facts in favor of the

non-movant, if genuine doubts remain and a reasonable fact-finder could find for the

party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises,*

*Inc. v. First Chicago Corp*., 975 F.2d 1290, 1294 (7th Cir.1992); *Wolf v. City of*

*Fitchburg*, 870 F.2d 1327, 1330 (7th Cir.1989). But if it is clear that a plaintiff will be

unable to satisfy the legal requirements necessary to establish his or her case, summary

judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v.*

*AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir.2003). Further, a failure to prove one

element "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

## *Discussion*

### Hostile Work Environment

In order to successfully pursue a hostile work environment claim under Title VII,

Hine needs to be able to show that: (1) she was subjected to unwelcome sexual conduct,

advances, or requests; (2) because of her sex; (3) the acts were severe or pervasive

enough to create a hostile work environment; and (4) there is a basis for employer

liability. *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 684 (7th Cir. 2010). The objectionable

conduct at issue is not restricted to purely "sexual conduct," as sexist or anti-female

behavior can also create a hostile work environment based on gender. *Scruggs v. Garst*

*Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009).

EIP begins its defense by challenging whether Hine has met the very first prerequisite to demonstrate that she was the target of unwelcome sexual requests, advances or other gender-based objectionable conduct. Literally speaking, there were clearly no "requests" of a sexual nature, but Hine maintains that Beluk's conduct amounted to sexual advances and argues that because she did not respond to those advances, Beluk fired her without good cause. However, Hine's attempt to characterize Beluk's conduct as sexual advances is unconvincing. Applicable EEOC regulations do not attempt to define what constitutes a sexual advance (*see* 29 C.F.R. § 1604.11(b)), but the type of conduct described by Hine in this case has not been recognized or referred to by courts as "sexual advances." As noted by one treatise author in reviewing the case law:

> ... sexual advances generally are viewed as invitations to participate in sexual activity and may form the basis of either a *quid pro quo* or hostile environment sexual harassment claim. A sexual advance or request for sexual favors might consist of a request to spend the night, have an affair, go skinny dipping, move into an apartment together, go out for a drink or date after repeated refusals, "make out" or, in one way or another, have sex.

1 *Alba Conte*, *Sexual Harassment in the Workplace*, § 3.05(B)(1) at 3-89 (4th ed. 2010).

Given that Hine's complaint does not involve sexual advances by Beluk, we next consider whether it qualifies as sexual and/or sexist conduct which is the remaining category of offensive and unwelcome behavior. Do conversations which include sexual

innuendo and jokes along with a person's flirtatious actions and demeanor amount to the type of conduct which can satisfy the first element a plaintiff must demonstrate to pursue a hostile environment claim? So long as the conduct is unwelcome and contains some degree of sexual or sexist meaning, we think the first element is satisfied. *See Wyerick v. Bayou Steel Corp.*, 887 F.2d 1271, 1275 (5th Cir. 1989)("the gravamen of any sexual harassment claim" is the unwelcome nature of the conduct).

In this instance, Hine has testified that when she and Beluk were together in the same place and he would make unwelcome, suggestive remarks, she would walk away from Beluk or turn her head to show him that his comments were unwanted and, if the comments came while they were on the telephone, she would simply remain silent. In one specific instance in November 2007, when Beluk was discussing spousal relationships during a telephone conversation with Hine, she responded by telling him to stop making what she believed were inappropriate comments: "That is too much information,"she said. Hine also claims to have complained to Bourke about Beluk's comments and behavior. Bourke's subsequent denial that such conversations ever took place simply creates an issue of fact. In the end, because there is clearly no evidence that Hine welcomed Beluk's comments or stares, we will conclude in favor of the nonmoving party by inferring sexual or sexist behavior by Beluk.

Nevertheless, to survive summary judgment, Hine must do more than simply adduce evidence to demonstrate that she was the target of unwelcome sexual or sexist

comments and behavior.  She must also demonstrate that her work environment was both objectively and subjectively offensive and that the conduct was pervasive or severe. *Scruggs*, 587 F.3d at 840.  Here, the Court must take into account the totality of the circumstances in determining whether there is sufficient evidence of a hostile work environment.  *Wyninger v. New Ventures Gear, Inc.,* 361 F.3d 965, 975 (7th Cir. 2004). The Seventh Circuit offered the following direction for assessing the sufficiency of supporting evidence in their decision in the *Scruggs* case:

> Factors in our assessment include the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance.  Offhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment.

*Scruggs*, 587 F.3d at 840-41 (citations omitted).

The final sentence of the foregoing quotation from *Scruggs* is a near perfect description of the conduct complained of by Hine in this case.  Beluk is the only individual of whom Hine complains.  In the approximately seven months she worked for EIP, she was with Beluk in person on only four occasions.  His face-to-face flirtations and "checking me out" stares on those four occasions can not reasonable be viewed as rising to the level of severe or pervasive conduct, egregious enough to have altered Hine's work environment.  Beluk's more frequent telephone contacts with Hine and his propensity to discuss personal matters, drop sexual innuendos or make sexist comments such as suggesting that Hine and other women should take advantage of their sex appeal

to assist with marketing efforts, fit the description of offensive, offhand comments. None of the complained of conduct was physically threatening or objectively lewd in nature.[3] In fact, affidavits from at least two of Hine's female contemporaries who were also employed by EIP indicate that Beluk's comments regarding the attractiveness of the women on a given day were interpreted by them as compliments without any amorous connotations.

Hine may, indeed, have been made to feel uncomfortable by some of Beluk's comments, but Title VII does not guarantee that an employee will experience a certain comfort level at work, only that she not experience an abusive, hostile work environment. To be actionable as a hostile work environment within the context of Title VII's antidiscrimination provisions, the complained of conduct must be extreme to the point of creating an abusive working environment. *Pennsylvania State Police v. Suders,* 542 U.S. 129, 145 (2004);*Faragher v. City of Boca Raton,* 524 U.S. 775, 786 (1998).[4]

---

[3]In her brief, Hine referred often to a comment Beluk allegedly made to the effect that she should use her "sex" to assist with their marketing efforts, as though Beluk was encouraging her or other women to engage in illicit sexual conduct to promote EIP. However, during her deposition Hine was asked to explain what she understood Beluk to mean when he referred to a woman using her "sex" to assist with marketing and she explained that she believed he was encouraging her to use her sex appeal as a woman, such as in the way she dressed and dealt with podiatrists on office calls. While such a comment by Beluk was clearly sexist, unprofessional and likely unwelcome, Hine clearly did not interpret it as being severe or humiliating or suggestive of illicit conduct to obtain business.

[4]Plaintiff cites *Pennsylvania State Police v. Suders* and *Faragher v. Boca Raton* to argue that EIP is strictly liable for the harassment of Beluk because his harassment culminated in the termination of her employment when she did not respond to his sexual advances. This argument
(continued...)

Finally, case law supplies a plethora of examples where summary judgment was granted in favor of the defendant and that judgment was affirmed on appeal and where the conduct complained of by the harassing party was far more objectionable and pervasive than what has been described here by Plaintiff. *Scruggs v. Garst Seed Co.,* 587 F.3d 832 (7th Cir. 2009)(supervisor said to have repeatedly demeaned employee by stating that she was "made for the back seat of a car," a "redneck," a "dyke," "too dumb to catch on," and was responsible for holding parties which were "drunken fiascos"); *Stewart v. Mississippi Transp. Com'n.*, 586 F.3d 321 (5th Cir. 2009)(male supervisor who had been disciplined for sexually harassing plaintiff while a co-employee told plaintiff that they should be "sweet" to each other and every few days would tell her he was in love with her); *Wolf v. Northwest Indiana Symphony Society*, 250 F.3d 1136 (7th Cir. 2001)(female symphony president accused of telling male employee what she wore to bed at night, that she had not had sex in six years, that she was glad there was "muscle" like him in the office, that

---

[4](...continued)
is miscast for several reasons. First, as we noted previously, there is simply no reasonable way to interpret the acts and statements of Beluk, as described by Hine, as sexual advances. Next, Hine's argument addresses the prerequisite that a basis for liability exist, but neither of the cited cases negates the requirement that the alleged harassment be severe or pervasive enough to create a hostile work environment. Finally, there is no evidence to link Hine's termination to anything other than the issue which arose out of her allegedly false time reports. The Executive Vice-President of the company directed Beluk to terminate Hine based on Hine's time submission for the week following Christmas and her inability to produce a marketing plan after initially stating that she had been working on it at that time. Even if Blue chose to fire Hine because Beluk did not accurately convey the fact that he had asked Hine to review company materials, plan her strategy or read a book on marketing, her attempt to draw some otherwise attenuated connection between Beluk's alleged disappointment at her rejection of him and her termination is simply beyond any reasonable inference from the evidence here.

men were inherently untrustworthy, using the shower in his hotel room and holding his arm while he walked her to her car); *Pryor v. Sefarth, Shaw, Fairweather & Geraldson,* 212 F.3d 976 (7th Cir. 2000)(legal secretary claimed that attorney told her he would like to see her in any lingerie she might buy from a catalog, preferred when she wore open-toed shoes, wanted to know if clothes she had in a bag by her desk came from Frederick's of Hollywood, and asked her to look at bondage pictures that were part of a case file he was working on); *Morris v. Oldham County Fiscal Court,* 201 F.3d 784 (6th Cir. 2000) (employee alleged that supervisor told dirty jokes in her presence, after receiving a subpar evaluation made a sexual comment about how the employee might become "excellent," referred to her as "Hot Lips," and commented on the clothes she wore); Gleason *v. Mesirow Financial, Inc.*, 118 F.3d 1134 (7th Cir. 1997)(employee complained that manager referred to female customers as "bitchy" or "dumb," appeared to ogle female employees, flirted with female relatives of employee, commented on a woman's anatomy, referred to spending time in a nudist camp and informed employee that he dreamt of holding her hand); *Baskerville v. Culligan Intern. Co.*, 50 F.3d 428 (7th Cir. 1995)(over the course of seven months supervisor called employee "pretty girl," suggested she run around naked, made vulgar grunting noises when she wore a leather skirt, suggested the room became hot when she stepped in, told her he had been lonely in his hotel room and made a vulgar gesture to simulate masturbation).

In the case at bar, the harassment simply was not so severe or pervasive as to have

objectively altered Hine's working conditions.  Accordingly, summary judgment in favor of EIP is warranted with respect to her hostile environment claim.

*Retaliation*

"Title VII protects employees from retaliation for complaining about the types of discrimination it prohibits."  *Antonetti v. Abbott Laboratories*, 563 F.3d 587, 592 (7th Cir. 2009).  A prima facie case of retaliation under Title VII requires the plaintiff to present evidence that:  (1) she engaged in statutorily protected activity such as complaining of discrimination or sexual harassment; (2) suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action.[5] *Russell v. Bd. of Trustees of the University of Illinois at Chicago,* 243 F.3d 336, 344 (7th Cir. 2001).

Hine claims that she engaged in protected activity when she complained to Beluk and Bourke.  She contends she had several conversations with Bourke wherein she complained of Beluk's conduct and conversations.  In her response brief, Hine refers to Bourke as her designated EIP trainer, suggesting Bourke had more authority with EIP than simply being Hine's counterpart in Dayton, Ohio.  However, a review of the

---

[5]This is referred to as the direct method of proving retaliation.  The indirect method of proof is available as well to a plaintiff which, in addition to requiring a showing that the plaintiff engaged in protected activity, requires evidence that she was performing up to expectations and that, despite her acceptable performance, she suffered an adverse employment action when others similarly situated were treated more favorably.  *Luckie v. Ameritech Corp.,* 389 F.3d 708, 714 7TH Cir. 2004).  Hine has not based her claims on the indirect method of proof.

Plaintiff's deposition testimony suggests that her conversations with Bourke were more akin to co-worker discussions or mutual gripe sessions than an attempt by Hine to engage in the protected activity of registering a complaint of discrimination. But we need not draw that conclusion as a basis for excluding her complaints to Bourke as immaterial. It is axiomatic that an employer can not retaliate if it is unaware of the protected activity engaged in by the plaintiff. *Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004). Here, no evidence has been adduced to show that either Blue or Beluk was aware of Hine's complaints to Bourke, and in her affidavit Bourke denies both the alleged conversations with Hine and the fact that she ever registered complaints about Beluk's behavior.

The single instance in which Hine complained to Beluk, which Hine asserts was protected activity, occurred when, during the course of a November 2007 telephone conversation, she asked him to stop the inappropriate discussion, jokes and innuendo regarding their respective relationships with their spouses ("who wore the pants" "making up after arguments" "which one took the initiative"). Unfortunately for Hine, a request to Beluk that he stop the remarks and change the subject of a conversation does not meet the test for protected activity. Her statement to Beluk lacked the specificity necessary to alert Beluk that it was being made in connection with her federally protected rights. "Although filing an official complaint with an employer may constitute statutorily protected activity under Title VII, the complaint must indicate the discrimination occurred

because of sex, race, national origin, or some other protected class." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006). Hine's directive to Beluk was clearly an attempt to change the direction of a telephone conversation, and as such, far from the type of complaint that would put Beluk (or anyone else) on notice that she believed her statutory right to be free from discrimination or sexual harassment was at issue.

Because Hine has failed in her effort to demonstrate that she engaged in protected activity of which her employer was aware, her retaliation claim is a nonstarter, and we need not determine whether any of the other prerequisites of a prima facie case were met. Summary judgment in favor of EIP is thus warranted on this claim as well.

### *Defendant's Motion For Rule 11 Sanctions*

Defendant has filed a motion pursuant to Fed.R.Civ.P. 11, requesting an award of attorneys fees as a sanction against Plaintiff for her pursuit of what EIP contends was a frivolous hostile work environment claim. As we have now determined, Plaintiff does not prevail on this claim. Even so, we cannot conclude that unusual circumstances of the sort which would warrant imposition of sanctions against the Plaintiff or her attorneys exist here (i.e., improper purpose, harassment, fraudulent joinder, vexatious multiplication of proceedings ... etc.). Rule 11 is not meant to serve as a fee shifting mechanism. See 23 *Moore's Federal Practice* § 11.24[3] (3d ed.2010). Accordingly, EIP's Motion For Sanctions is denied.

*Conclusion*

For the reasons explicated above, Defendant's Motion for Summary Judgment (Doc. #36) is GRANTED and Defendant's Motion for Sanctions (Doc. #48) is DENIED. A separate final judgment shall be entered in favor of EIP; each side shall bear its own fees, and costs shall be borne by the Plaintiff.

IT IS SO ORDERED.

Date: 02/25/2011

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Richard L. Darst
COHEN GARELICK & GLAZIER
rdarst@cgglawfirm.com

Toni L. DiGiacobbe
tld@eipmri.com

Maureen E. Ward
WOODEN & MCLAUGHLIN LLP
mward@woodmaclaw.com